# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 20-0956V

|  |  |
|---|---|
| HANNAH BAKER WARNOCK,<br><br>　　　　　　　Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　　　Respondent. | Chief Special Master Corcoran<br><br><br>Filed: April 20, 2026 |

*John D. Kassel, Kassel McVey Attorneys at Law, Columbia, SC, for Petitioner.*

*Katherine Carr Esposito, U.S. Department of Justice, Washington, DC, for Respondent.*

### DECISION AWARDING DAMAGES[1]

On August 3, 2020, Hannah Baker Warnock filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she suffered vasovagal syncope within one hour of receiving a meningococcal vaccine on June 27, 2019, which led to a "fall and fractured skull, traumatic subarachnoid hematoma, hyponatremia, pituitary injury with syndrome of inappropriate antidiuretic hormone ("SIADH"), cerebral contusion, a blood clot, and personality changes from a traumatic brain injury." Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masers.

Although Ms. Warnock has been found entitled to compensation, the parties could not agree on the damages to be awarded for a number of items, including past and future pain and suffering, the amount and form to be awarded for the life care plan, and an

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

amount, if any, for Ms. Warnock's lost earning capacity. Thus, an evidentiary damages hearing was held on March 17, 2025. For the reasons set forth below, I find that Petitioner is entitled to compensation in the amount of $170,000.00, for her past or "actual" pain and suffering only (no amount awarded for future pain and suffering); $6,978.97, for her past unreimburseable expenses; and future medical expenses comprised of 1) a lump sum of $2,904.00 for first year expenses, and 2) an amount sufficient for respondent to purchase an annuity contract that will provide payments for the life care items contained in Respondent's life care plan, as illustrated by the chart at Appendix, Tab A.

## I.    Procedural History

On September 3, 2021, I issued a ruling on entitlement in favor of Petitioner. ECF No. 37. But the parties were unable to resolve damages informally, and Petitioner filed a Motion for a Hearing on Damages on February 1, 2023. ECF No. 62. On May 12, 2023, Petitioner filed her brief in support of damages ("Mot."), and Respondent filed a Response on June 12, 2023 ("Opp."). Petitioner filed a reply ("Reply") memorandum on July 12, 2023. ECF Nos. 68, 71-74, 77. I heard arguments from both parties during the March 17, 2025 damages hearing.

## II.    Factual History

On June 27, 2019, at 10:05 a.m., Ms. Warnock (a 20-year-old technical college student at the time) went to her pediatrician's office for her annual checkup. Petitioner's Exhibit ("Ex.") Ex. 1 at 1; Ex. 3 at 18, 19. The first part of her visit was routine (Ex. 3 at 19), and Ms. Warnock was administered the Bexsero and Menactra meningococcal vaccines (*id*. at 18).

At 10:56 a.m., emergency 9-1-1 dispatch received a call from the pediatrician's office. Ex. 1 at 2. Ms. Warnock's pediatrician noted:

After immunizations were given, I was at my computer station and heard what sounded like something being thrown against a wall. At that same moment, I heard one of our nursing staff call for Brandy Tollison, LPN, who is nursing with me today. When I entered the patient's examination room, the patient was on the floor in the corner with her neck flexed. Dr. Joseph entered the room at that time. I instructed [sic] nursing staff to obtain BP [blood pressure], Pulse and Blood Sugar and that EMS be contacted to transport the patient. The patient was bradycardic w/HR of 51, BP 113/60 and BS 106. I called the mother to inform her that her child had passed out and that we were transporting her via EMS to KHED [Kershaw Health Medical Center]. I initially told the mother that the patient had fallen off the

2

> table, however, the incident was not witnessed by any staff and patient was unaccompanied during this visit… When EMS arrived, I requested a neck collar due to the position of the patient when she was found on the floor. EMS arrived and assumed care of the patient. She was transported by EMS to KHED.

Ex. 3 at 19-20. The EMS staff found Ms. Warnock alert and oriented, but she did not remember her age, and it was noted that she also did not remember falling or passing out. Ex. 1 at 4. Petitioner reported pain to the occipital region of her head, and in her cervical spine area. *Id*. EMS personnel noted no (external) bleeding, no obvious injury, and no swelling or depressed area. *Id*. at 3. Ms. Warnock testified that she did not recall anything about the incident, except having "tunnel vision" meaning that "the whole room got black and then smaller and smaller and then --- and completely black… I don't really remember anything after the tunnel vision." Tr. at 13. She next recalled waking up in the emergency room with a neck brace on. *Id*.

Ms. Warnock was taken to Kershaw Health Medical Center ("KHMC") Emergency Department ("ED"), and the apparent fall history was recounted, along with the comment that Petitioner "complains of a moderately severe, throbbing headache with photophobia and nausea similar to previous migraines she has had in the past. She [had] two concussions in the past playing sports. She complains of some mild posterior neck pain with range of motion. She denies new weakness, numbness, slurred speech or vomiting." Ex. 3 at 41.

Petitioner underwent a computerized tomography ("CT") scan of her head, which showed:

> Bilateral inferior frontal subarachnoid hemorrhage [SAH], left greater than right. Hemorrhagic contusions noted along the left inferior frontal lobe. Small amount of extra-axial hemorrhage noted along the left frontotemporal convexity and anterior interhemispheric fissure. Nondisplaced occipital to suboccipital skull fracture lines extending to posterior aspects of bilateral jugular foramina. Nondisplaced fracture involving the sphenoid sinus at the level of the cavernous sinus. Recommend CT angiogram of the head, given skull base fractures to exclude vascular injury.

Ex. 3 at 33. A computed tomography venography of the brain showed "a small filling defect, could be a small thrombus, no complete obstruction." Ex. 15 at 39. Additional imaging at KHMC was performed: a CT of the cervical spine, which showed "no acute C-spine fracture of dislocation" (Ex. 3 at 34); pelvis imaging, which showed no acute fracture (*id*. at 35); and a portal chest image, which showed no acute cardiopulmonary abnormality

3

(Ex. 6 at 59). The impressions were syncope, subarachnoid hemorrhage, cerebral contusion, and basilar skull fracture. Ex. 3 at 36. Ms. Warnock was described to be in critical condition, and arrangements were made for her transfer to an acute facility. *Id*.

Ms. Warnock was helicoptered to Prisma Health Richland Hospital ("Richland"), where she stayed from June 27, 2019, until her discharge on July 8, 2019. Ex. 14 at 55-59. During her stay, she was seen by neurosurgery, neurology, and endocrinology services. *Id*. at 55. She was diagnosed with acute hyponatremia and syndrome of inappropriate antidiuretic hormone secretion ("SIADH"). Ex. 2 at 12. Heparin was initiated and Petitioner was later transitioned to Coumadin, a blood thinner. Ex. 14 at 55. Ms. Warnock became hyponatremic (low sodium) on July 2, 2019, and she received a 3% saline solution. *Id*. She was placed on a 750cc fluid restriction. *Id*. On the day of discharge, Petitioner had normal sodium levels. *Id*.

Regarding her hospitalization, Ms. Warnock testified that she did not remember much. Tr. at 15. She stated that she was "in and out of it a lot of the times," but she did recall that it was difficult for the medical staff to control her electrolytes, magnesium, sodium, and potassium levels. *Id*. Ms. Warnock recalled that she started hallucinating at one point, and she was rushed into a CT scan for assessment. *Id*. She stated that a lot of her hospitalization was spent in observation, testing, and providing a heparin drip. *Id*. Ms. Warnock stated that upon discharge, she had difficulty walking for about two to four weeks. *Id*. at 19. Her mother bought her a walker to assist with ambulation. *Id*. Tr. at 19.

On July 18, 2019, Ms. Warnock saw her endocrinologist in follow-up for her SIADH. Ex. 2 at 16. Petitioner reported she still had daily headaches (improved with Tylenol), that she got dizzy sometimes when walking around a lot, and that her sense of taste and smell were off. *Id*. She was noted to be doing well, and there was hope that her condition would resolve in six to 12 months. *Id*. at 17. Her sodium blood level was within normal limits, and there was discussion of loosening Petitioner's fluid restriction. *Id*. Ms. Warnock's pediatrician submitted a report about Petitioner's episode to the Vaccine Adverse Events Reporting System. Ex. 3 at 56-57.

On July 25, 2019, while Ms. Warnock was in the laboratory at KHMC for a blood draw, she had a shaking episode and loss of consciousness. Ex. 6 at 15. She was already wearing her C-collar from her prior injury, and was then seen in the KHMC ED. *Id*. A CT of her head showed no acute intracranial process; the previously seen bilateral frontal extra-axial hemorrhage had resolved. Ex. 3 at 31. Mild bilateral inferior frontal encephalomalacia was thought likely to be sequela of the prior June 2019 trauma. *Id*. A CT of the spine showed no acute fracture or dislocation. *Id*. at 32. Petitioner was again transported from KHMC to Richland, this time by ambulance, for concern about possible

4

seizures following her prior injury. She was admitted for observation. Exs. 5 at 3-4; 6 at 13-14.

The next day, on July 26, 2019, a treating neurologist considered Ms. Warnock's symptoms to be seizures but felt that with the precipitating vaccination and blood draw events, this appeared most consistent with presyncope, followed by syncope with syncopal myoclonus. Ex. 9 at 18. Ms. Warnock underwent a 24-hour EEG to monitor for epilepsy, and the findings were normal. Ex. 10 at 25. She also underwent an MRI of her brain which showed no new areas of abnormality and "internal improvement in bifrontal sequela of hemorrhagic contusions with early encephalomalacia changes." Ex. 9 at 42. Lab work was benign, except for Petitioner's ongoing hyponatremia along with her diagnosis of SIADH following her head trauma. *Id*. The most likely etiology and diagnosis of Petitioner's condition was vasovagal syncope, due to her prodrome of nausea and short recovery time. *Id*. at 21. She was instructed to lie down for future shots, blood draws, and injections. *Id*. Ms. Warnock was discharged on July 28, 2019. *Id*.

On August 15, 2019, Ms. Warnock reported to Primary Care Camden ("Camden") as a new patient to establish care. Ex. 7 at 6. Her recent medical history was reviewed, and it was noted she had plans to see an eye doctor about her vision changes during the acute event and that she still needed to be cleared by neurology to drive. *Id*. Ms. Warnock was also dealing with "the sense of loss that she has about not going to Florida for her junior year [of college] this fall." *Id*. She was noted to have anxiety and a cough. *Id*. at 5-6. That same month, Petitioner was seen at Richland for a CT angiography of her brain. Ex. 8 at 43. The impression was "[r]esolution of previously noted right transverse sinus thrombosis with complete recannulization of the vessel. *Id*. at 44. Petitioner's sodium level was reported at 121 mmol/L, down from 135 mmol/L. *Id*. at 45.

On September 18, 2019, Ms. Warnock underwent another CT angiography of her brain at Richland. Ex. 8 at 24. The summary showed "[n]o major dural venous sinus or deep cerebral venous thrombosis. The right transverse sinus remains widely patent with normal cerebral CT venogram." *Id*.

On October 22, 2019, Ms. Warnock saw her endocrinologist for follow up of her SIADH. Ex. 2 at 19. She was noted to be doing well, and had no complaints of dizziness, headache, vision changes, fainting episodes, or altered mentation. *Id*. Ms. Warnock remained asymptomatic, with a sodium level of 134 mmol/L, and was on a drink to thirst mechanism. *Id*. at 22. Petitioner planned to return to school in January and the hope was that her SIADH would resolve within the next six months. *Id*.

On December 3, 2019, Ms. Warnock saw her nurse practitioner at Camden for complaints of her heart racing and being unable to catch her breath. Ex. 7 at 9. Petitioner

relayed two other episodes of tachycardia, one four days prior and the other about a month before that. *Id*. at 9, 11. She reported that she was no longer taking Coumadin and was ready and planned to go to college in Florida. *Id*. at 11. A referral was made to a cardiologist, and Ms. Warnock was seen the same day. Exs. 4 at 30; 7 at 12. An EKG performed in the office was abnormal with sinus arrhythmia and bradycardia. Ex. 4 at 30.

On December 18, 2019, Ms. Warnock returned to her cardiologist for a review of her test results, and she was noted to have mild bradycardia. Ex. 4 at 24. Petitioner reported that she was doing about the same, but the day before had an episode of heart racing, becoming dizzy, and needing to sit. *Id*. She was prescribed Florinef, a fludrocortisone. *Id*.

On January 6, 2020, Ms. Warnock returned to her cardiologist for surveillance after starting Florinef. Ex. 4 at 22. Petitioner reported that the first four days were "really bad," but she had been "doing great since then," and reported no more acute episodes. *Id*. Ms. Warnock was leaving for college in Florida that day, and she was advised to remain on her medication and keep herself hydrated. *Id*.

Ms. Warnock next saw her cardiologist on July 6, 2020. Ex. 4 at 19. She complained of intermittent palpitations, which she described as worse with intermittent fasting. *Id*. She had stopped using Florinef. *Id*. Her cardiologist encouraged her to restart the Florinef, as her response to taking the medication was good. *Id*.

On January 6, 2021, Ms. Warnock returned to her cardiologist for a six-month checkup. Ex. 36 at 2. Her physical exam that day was noted to be unremarkable. *Id*. She reported intermittent episodes of fluttering and tachycardia with associated shortness of breath, symptoms which became exacerbated with the use of caffeine. *Id*. She was only using Florinef on an "as needed" basis. *Id*. She underwent heart monitoring for one week and her results were "essentially normal." *Id*. at 2, 5. Follow-up was advised in another six months. *Id*. at 2.

On April 1, 2021, Ms. Warnock was seen by an endocrinologist for her hyponatremia. Ex. 26 at 3. She denied frequent headaches, nausea, vomiting, gait issues, dizziness, vision changes, fainting episodes, and altered mental status. *Id*. Petitioner reported her menstrual periods had been irregular. *Id*. She also stated that she was frequently fatigued. *Id*. Lab results showed that her sodium level was 124 mmol/L, within normal limits. Petitioner was instructed to return in one year. *Id*. at 5, 8.

On April 24, 2021, while visiting Disney Springs with her friends, Ms. Warnock stated that she was very dizzy and weak and could feel her blood pressure was very low. Tr. at 20. She stated that she was on the floor of the bathroom for about 45 minutes and could not get up. *Id*. Ms. Warnock was taken by ambulance to Advent Health Emergency

Department for complaints of weakness and fatigue. Ex. 27 at 26. Petitioner reported that she had been feeling too weak to eat or drink that day, had diarrhea, and was on her menses. *Id*. It was noted that she had taken three Midol with caffeine, which may have triggered this particular episode. *Id*. at 20. She was diagnosed with acute weakness and near syncope, given a prescription for fludrocortisone for electrolyte imbalance, and advised to follow up with her primary care physician. *Id*.

On October 4, 2021, Ms. Warnock returned to her cardiologist for her five-month general checkup. Ex. 36 at 13. She reported still having dizziness and feeling lightheaded, but her recent symptoms had not been as severe. *Id*. Ms. Warnock reported having COVID-19 in September of 2021, and her cardiologist advised her current symptoms could possibly worsen in the coming few months, based on his experience with other cardiac patients who had also had COVID-19. *Id*. Petitioner had not been taking Florinef daily, but she was encouraged to restart it as she continued to experience symptoms. *Id*. Follow-up was advised in one year. *Id*.

On October 7, 2021, Ms. Warnock underwent a routine gynecological visit which was normal. Ex. 39 at 1-4. On December 7, 2021, she had bloodwork done which showed that her sodium level was in the normal range. Ex. 40 at 7. On December 8, 2021, Petitioner began care with a new endocrinologist, Brooke McAdams, M.D. Ex. 37 at 2.

On November 30, 2021, Ms. Warnock was taken to Kershaw Health Medical Center. Petitioner testified that she was working on her farm when she suddenly felt dizzy and lightheaded before she fell to the ground. Tr. at 22. She stated that her mother caught her before she hit the ground. *Id*.; Ex. 31 at 14. At Kernshaw, her vitals were normal, and she was given potassium and a heavy salt meal. Ex. 31 at 5. A CT of her head was normal. Id. at 8-9. Ms. Warnock reported that she had not been taking her medication regularly and only when she felt symptomatic. *Id*. Petitioner was instructed to take her medication twice daily as scheduled until her doctors told her to stop. *Id*. at 6. She was diagnosed with hyponatremia and discharged with instructions to follow up with her physicians. *Id*. at 10.

On December 21, 2021, Ms. Warnock underwent MRI imaging of her brain and pituitary gland. Ex. 38 at 3. The MRI indicated the likely presence of a tiny Rathke cleft cyst. *Id*. There were no other abnormalities noted. *Id*. In comparison to Petitioner's MRI from July 26, 2019, the December 21, 2021 MRI again showed left greater than right chronic bifrontal posttraumatic encephalomalacia. *Id*.

On May 11, 2022, Ms. Warnock saw Dr. McAdams in follow-up. Ex. 37 at 2. Dr. McAdams noted that Petitioner "needs to take in salt tablets due to [the] desire to drink more during the summer." *Id*. at 3. However, Ms. Warnock was described as "stable." *Id*.

Dr. McAdams noted that prior ACTH [adrenocorticotropic hormone] and cortisol tests were normal and TFTs [thyroid function tests] were in a normal range. *Id*. Her doctor recorded that "[t]here was hope that SIADH was transient and would slowly improve," but that "unfortunately [there are] no signs of recovery 3 years out from initial presentation." *Id*. at 7.

On October 18, 2022, Ms. Warnock saw her cardiologist for her yearly visit. Ex. 36 at 16. She reported more palpitation episodes in the preceding four-to-six-month period, with episodes of near syncope once every one to two weeks. *Id*. A physical exam was unremarkable, but an EKG done in the office was abnormal, with sinus rhythm and sinus arrhythmia noted. *Id*. Further diagnostic testing was planned. *Id*.

Ms. Warnock returned to her cardiologist on November 9, 2022, to review her cardiac results. Ex. 36 at 19. The results were noted to be "unremarkable." *Id*. Overall, Ms. Warnock was noted to be "doing well," and she was advised to continue Florinef and follow up in one year. *Id*.

On May 13, 2023, Ms. Warnock had her annual gynecologic exam with Dr. Jully Aguirre. Ex. 57 at 3. It was noted that Petitioner's seizures had resolved. *Id*.  Other than some minor issues with her menses, Ms. Warnock's examination was normal. *Id*. at 8-10.

On May 16, 2024, Ms. Warnock saw her PCP to confirm her pregnancy. Ex. 57 at 24. She was counseled on prenatal practices, and she was scheduled for regular routine appointments for the duration of her pregnancy. *Id*.

On September 4, 2024, Ms. Warnock was seen by Dr. Brooke McAdams for an endocrinology follow-up. Ex. 58 at 3. Petitioner reported that she was last seen in 2022 and that since then, she had "been fairly stable." *Id*. Ms. Warnock reported no recent hospitalizations or seizure activity, although she had continued her fluid restrictions to up to 2 and half liters a day. *Id*. Petitioner stated that she took sodium tablets once or twice week when she feels dizzy, but that the dizziness usually resolves within 20 to 30 minutes. *Id*. The notes state that Petitioner "feels well and is without complaint; sodium normal January 2024 prior to pregnancy. Hopefully SIADH was transient…" *Id*. at 6. Dr. McAdams stated that if the results of Petitioner's labs taken that day were normal, then the fluid restrictions would be further loosened. *Id*. Her exam was otherwise normal.

Ms. Warnock testified that she gave birth to a healthy baby girl on December 18, 2024. Tr. at 10. No additional medical records have been filed.

*Affidavit and Hearing Testimony*

a. *Hannah Warnock*

At the time Ms. Warnock prepared her affidavit in April 2023, she was working at Duck Bottom Planation, a hunt club located near Camden, South Carolina. Ex. 43. Her duties consisted of food preparation, working in the club's pro shop, and leading and coordinating women's activities. *Id*. Ms. Warnock also worked at her family farm which housed a bed and breakfast lodge. *Id*. On the farm, Petitioner was responsible for raising the sheep and event planning at the lodge. *Id.* Ms. Warnock holds a bachelor's degree in hospitality from Flagler College located in St. Augustine, Florida. Ex. 43.

Ms. Warnock stated that she has always been very active – participating in school softball and volleyball, and was later a consistent member at her gym. ECF No. 66-8 at 1. However, since her injury she cannot run for five minutes without getting dizzy. *Id*. She stated that she has to participate in gentler exercises like yoga and Pilates, but if she overextends herself, she will experience dizziness, fatigue, and shortness of breath. *Id*. Ms. Warnock states that other activities may trigger her symptoms such as stress, eating too fast, eating too much sugar, little sleep, or it can sometimes happen without warning. *Id*. When her symptoms occur, she has to lie down, place a cool rag on her head, and rest for at least 10 minutes so she can catch her breath. *Id*. Ms. Warnock states that these symptoms happen at least once a week. *Id*. She is on fluid restrictions and must take frequent breaks in an effort to prevent her symptoms from occurring. *Id*. at 2.

Ms. Warnock testified that she began working at Duck Bottom in November 2022. Tr. at 27. She described working at Duck Bottom as "a hospitality dream." *Id*. Ms. Warnock stated that the facility was located on the Wateree River, with a tiki bar, and music, and she was able to help host a number of different events*. Id*.

When she initially began working at Duck Bottom, Ms. Warnock was employed as a sous chef cooking breakfast and lunch. *Id*. She stated that she worked by herself prepping the food and helping to serve. Ms. Warnock explained that the clientele was small at the time, about six to 12 people, so it was manageable for her. *Id*. In January 2023, Petitioner was promoted to hospitality manager where she was still handling breakfast and lunch, but was also handling décor, table arrangements, and scheduling the women's activities. *Id*. at 28. Ms. Warnock stated that she also managed the entire pro shop as well as any big events that were held. *Id*. Petitioner explained that from November to December during the off-season, the work was manageable. *Id*. But as the hunting season began, the environment became faster paced and the work became more difficult. *Id*. at 29. Finally, in late March/early April 2024, she left Duck Bottom "because of the toll it was having on my physical health. I was napping every single day after work

for an hour and half to two hours. And it just – it was not worth it for me." Tr. at 30. Ms. Warnock testified that she was paid a $36,000.00 annual salary as the hospitality manager at Duck Bottom. Tr. at 32.

After leaving Duck Bottom, Ms. Warnock testified, she went to work at her grandparents' farm and bed and breakfast hospitality business, Old McCaskill's Farm, and remains employed there. Tr. at 33. Ms. Warnock testified that her grandmother takes care of the gardening and the animals, and Petitioner is in charge of the bed and breakfast. *Id*. Her duties consist of making phone calls, planning events, creating itineraries, answering emails, as well as cleaning the bed and breakfast. *Id*. at 33-34. She also cooked breakfast when guests were staying at the bed and breakfast. *Id*. at 34. Ms. Warnock stated that at some point, she had a conversation with her grandmother stating that her symptoms were not getting better and that she needed more breaks during the workday. *Id*. at 35. Petitioner also requested lessening her responsibilities at the farm to help cope with her symptoms. *Id*. After the conversation, Ms. Warnock stated that she was only handling the bed and breakfast and organizing events for the farm. *Id*. at 36-37. Petitioner stated that she was paid an annual salary of $30,700.00 at her grandparents' farm. *Id*. at 38.

In her affidavit and in her testimony, Ms. Warnock explained how her injuries and symptoms have affected her emotional state. Ex. 43. She stated that prior to her injury, she felt "fearless, ready to take on the world when it came to accomplishing a task that might seem hard to others." *Id*. However now, she is guarded and anxious about how certain activities at work and in her personal life might affect her. *Id*.

Ms. Warnock testified that she is still having many symptoms – at least once or twice a week with her smaller symptoms, and once or twice a month with her "presyncopal bigger symptoms." Tr. at 39. She stated that she has had some improvement in that her fatigue has decreased and her dizziness is not as present as it once was. *Id*.

Ms. Warnock gave birth to her daughter in December 2024. Tr. at 41. During her pregnancy, she experienced preeclampsia, but her pregnancy was otherwise normal. *Id*. Ms. Warnock testified that her current plan is to continue working at her grandparents' farm, managing the bed and breakfast. *Id*. She stated that as a result of her injury, she does not go out as much as she used to. Tr. at 42. She stated that she is more anxious and fearful that she may become overwhelmed and pass out like she did at Disney Springs. *Id*. Ms. Warnock testified that she is very cautious and monitors her heart rate with her apple watch. *Id*. She also stated that she is more "forgetful" and needs to make lists to ensure she does not forget something important. Tr at 43. Ms. Warnock stated that she does feel that she has a permanent injury, and that it's been a difficult period to get through. *Id*.

### b. Ashley Robinson

Ms. Ashley Robinson is Ms. Warnock's mother. Ex. 44. She stated that she operates a food truck business in Rembert, South Carolina and has three daughters, the oldest being Ms. Warnock. *Id*. Ms. Robinson described Ms. Warnock as an "outstanding athlete" in high school and before her accident. *Id.* She stated that Petitioner was very competitive and strived to be the very best she could be, which included attending Flagler College in Florida, to gain her degree and to work in international hospitality. *Id*.

Ms. Robinson detailed the events of June 27, 2019, when Petitioner received her vaccines and her medical course since that date. Ex. 44 at 1-2. Although Ms. Warnock was able to go to Flager in January 2020, Ms. Robinson felt very nervous because of Petitioner's symptoms and all the doctor appointments she needed to attend. *Id*. at 2. She describes the impact of Petitioner's vaccine injury as "life changing." *Id*. She stated that Petitioner "is an extremely hard worker and still wants to accomplish big things in life but she is limited as to what her body will allow her to do." *Id*. Ms. Robinson also stated that she is concerned about the financial impact of her daughter's vaccine injury and how it will affect her life as she ages. At the time she prepared her affidavit, Ms. Robinson stated that Petitioner was still under her father's insurance plan, but she would not be once she turned 26. *Id*. Thankfully, Ms. Robinson stated that Petitioner's current employer is understanding, but "she does not have the guarantee that all future employers will offer the same sympathy." *Id*.

### c. Madison Baker

Ms. Madison Baker is Ms. Warnock's younger sister. Ex. 45. In her affidavit, Ms. Baker characterized Petitioner as a very active and outgoing person "who was strong and secure in who she was." *Id*. But after her vaccine injury, Ms. Warnock "changed an immense amount emotionally, physically, and socially." *Id*. She described her sister as being more vulnerable and that her emotions were constantly fluctuating. *Id*. Ms. Baker stated that "[t]his accident has given Hannah a perpetual feeling of fear in her physical life with how her body is going to react to any activity which in return affects her emotionally and socially because this is such a different life than what she previously was used to before." *Id*. at 1-2.

## III.    Pain and Suffering Component

### a. Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an

11

award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematical formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by a Court of Federal Claims decision several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain

and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 595. Under this approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards – and properly emphasizes the importance in each case of basing damages on the specific injured party's circumstances.

### b.  Pain and Suffering Analysis

In this case, awareness of the injury is not contested. The record reflects that at all times, Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury. Petitioner requested $150,000.00, for her actual/present pain and suffering, plus an additional $25,674.97 (a yearly award of $7,500.00, for the duration of Petitioner's life expectancy (58 year) reduced to net present value) for a total award of $175,674.97. Mot. at 17. In reaction, Respondent stated that the evidence supported the lesser award of $105,000.00 for Petitioner's past pain and suffering only, with no future component appropriate. Opp. at 13-14.

In performing my analysis, I have reviewed the record as a whole, including all medical records, affidavits, declarations, and all other filed evidence, plus the parties' briefs, other pleadings, and the hearing testimony. My ultimate determination is based on the specific circumstances of this case, although I give some consideration to comparable cases. In addition, in any case in which the parties cannot agree to a damages component, I take into account my experience adjudicating damages generally – including the fact that even the most self-limiting and transient of vaccine injuries from an immediate-impact stance can have "significant treatment consequences." *Hietpas v. Sec'y of Health & Hum. Servs.*, No. 19-1702V, 2021 WL 688620, at *5 (Fed. Cl. Spec. Mstr. Jan. 15, 2021).

Because most vaccine injuries involving syncope, presyncope, and vasovagal responses are resolved informally, there are few reasoned decisions to guide the outcome in this case. Thus, Petitioner cites mainly GBS cases, with just two syncope cases by contrast - *Campbell v. Sec'y of Health & Human Servs.*, No. 20-038V, 2022 WL 1074979, at *1 (Fed. Cl. Jan. 4, 2023) and *Hietpas*, 2021 WL 688620 - to support her proposed award of $150,000.00, for pain and suffering.

Respondent cites to three cases to support the lesser sum he advocates for: (1) *H.S. v. Sec'y of Health & Human Servs.,* No. 14-1057V, 2015 WL 6155891 (Fed. Cl. Spec. Mstr. Sept. 25, 2015); (2) *Hietpas;* and (3) *Marcillo v. Sec'y of Health & Human Servs.*,

2023 WL 3452274, at *7 (Fed. Cl. Spec. Mstr. May 15, 2023).

In *H.S.*, a petitioner experienced a syncopal episode after receiving the Tdap vaccine, resulting in head trauma, a concussion, and skull and a C1 vertebra fracture. *H.S.*, 2015 WL 6155891, at *1. That petitioner was required to wear an immobilizing cast for six weeks and was unable to participate in sports. *Id.* at *3. Despite the clear imposition the claimant suffered from treatment, the special master reasoned that $60,000.00 was an appropriate amount to award in pain and suffering because the minor did not have a permanent injury, with his suffering evidenced particularly by his inability to participate in sports for nearly six months. *Id.* at *3.

The *Hietpas* petitioner was awarded a higher sum - $140,000.00 - for the pain and suffering she experienced as a result of a post-vaccination syncopal injury. But the severity of her injury, and invasive treatment it required, was more obviously significant than the claimant in *H.S*. That individual sustained a chin laceration (causing permanent scaring), a jaw fracture, and underwent ORIF surgery two days later. Although she was noted to be healing well in the aftermath of her surgery, the *Hietpas* petitioner reported jaw pain, ear pressure, and intermittent difficulty chewing in the following months. Approximately seven months after surgery, her complaints included a clicking and popping sensation when opening her mouth. And despite attending seven sessions of physical therapy, she was eventually assessed with right and left TMJ displacement with reduction. Approximately one year after her injury, she was fitted with an orthopedic cast that had to be worn for 18 hours a day for a year. Based on this timeline, petitioner's course of treatment lasted approximately two years after her syncopal episode.

In *Marcillo*, 2021 WL 4704789, a petitioner suffered a syncopal episode after being administered a Tdap vaccine. *Id*. at * 2. The petitioner had lost consciousness and hit his head against a metal table before falling on to the ground. *Id*. Ultimately, the *Marcillo* petitioner underwent four surgical procedures in a seven-month period – all of which were complex. *Id*. In addition to surgery, the petitioner's jaw was wired shut for approximately one month. *Id*. During this time, the petitioner was required to abide by a liquid diet and was forced to "vacuum" his mouth to suction out pooling blood and saliva. *Id*. Braces were placed on petitioner's approximately six months later. *Id*. Once the petitioner's orthodontic treatment was completed, he was required to undergo the extraction of his wisdom teeth and removal of the hardware near his right condyle. *Id*. The petitioner would then undergo a total joint replacement once a mold of his jaw was taken. It was found that based on this timeline, the petitioner's course of treatment was likely to extend over a total of at least four years. *Id*.  Considering the severity and duration of the petitioner's syncopal injury along with the personal hardships he experienced as a result, he was awarded the maximum $250,000.00 in actual pain and suffering. *Id*.

14

While the *H.S., Hietpas, and Marcillo* cases certainly provides some aid in assessing the proper measure of damages in this case, there have been three additional syncope cases that provide additional insight – *Campbell v. Sec'y of Health & Human Servs*., No. 20-038V, 2022 WL 1074979, at *1 (Fed. Cl. Jan. 4, 2023); *Neff v. Sec'y of Health & Human Servs*., 2010 WL 2710646 (Fed. Cl. Spec. Mstr. June 15, 2010), and *Hendricks v. Sec'y of Health & Human Services*, No. 19-1061V, 2025 WL 2606536, at *1 (Fed. Cl.  Aug. 6, 2025). All involve fairly large pain and suffering awards.

In *Campbell,* a petitioner was awarded $190,000.00 after becoming dizzy shortly after receiving a flu vaccine and falling down a number of stairs, causing fractures and other injuries to her left tibia and fibula. *Campbell,* 2022 WL 1074979, at *2. However, due to the petitioner's poor bone quality, the injuries required three surgeries to repair. *Id*. at *3. Each surgery resulted in a brief hospitalization, prescription pain medication, and limited range of motion and weightbearing. *Id*. at *5. The *Campbell* petitioner's injuries also caused a significant disruption to her life – including medically extended absences totaling approximately one year (the petitioner was a histology specialist at Massachusetts General Hospital). Although the petitioner's initial injury was "transient and seemingly minor," the impact of the event was found to be uncommonly severe – justifying a fairly high pain and suffering award. *Id*.

The *Neff* case is from 2010, and it involved a petitioner who suffered vasovagal syncope caused by her receipt of an HPV vaccine. *Neff v. Sec'y of Health & Hum. Servs.,* No. 08-0906V, 2010 WL 2710646, at *1 (Fed. Cl. June 15, 2010). That claimant fell and struck her head, leading to brain bleeding, a concussion, and loss of sense of smell. *Id*. She experienced these injuries for more than six months. The case was resolved by a proffer, and the *Neff* petitioner was awarded a total of $110,000.00. *Id*.

In *Hendricks* (a case that I recently decided), the petitioner suffered a post-vaccination syncopal episode while crossing the street, where she fainted, striking her face on the sidewalk. *Hendricks*, 2025 WL 2606536, *1. That petitioner had to endure at least three separate surgeries, some of which took multiple hours to perform. *Id*. at *6. That petitioner also underwent four root canals, seven crowns, the placement of a metal plate with six screws in her chin, two tooth extractions, which were eventually replaced with dental implants. *Id*. Ms. Hendricks had her mouth fully wired shut for five weeks, and partially wired shut for at least another two weeks. *Id*. During this time, she was required to eat her food through a syringe. *Id*. After the wires were removed from her mouth, she was still required to eat soft foods for at least six months. *Id*. Ms. Hendricks attended at least 15 physical therapy appointments to assist in mobilizing her jaw to reduce pain while she spoke, chewed, and moved her mouth. *Id*. Because of her jaw injury, she also attended physical therapy to address the neck and shoulder pain she experienced as her jaw caused tension into these areas. *Id*. I awarded Ms. Hendricks the maximum

15

$250,000.00 pain and suffering amount for her injury. *Id*.

*Ms. Warnock's Pain and Suffering Award*

In making my determination on an appropriate award, I have also fully considered Petitioner's sworn affidavits and her testimony, in which she described, in detail, the excruciating pain she experienced throughout her injury as well as the circumstances that magnified the suffering and emotional distress she experienced as a result of her syncopal injury.

Ms. Warnock argues in her brief that she was hospitalized twice for a total of 14 days for her injuries, and was taken to emergency rooms on four occasions. Mot. at 17. She has been evaluated and treated by neurosurgery, neurology, endocrinology, cardiology, ophthalmology, and oral surgery, as well as her family are provider. *Id*. She experienced painful conditions including a skull fracture, subarachnoid hematoma and blood clots. *Id*. She has suffered debilitating symptoms from dysautonomia, hyponatremia, and SIADH. *Id*.

Respondent argues that although the circumstances Ms. Warnock endured were "frightening and unpleasant," her relatively good health does not appear to warrant a pain and suffering award of the amount that Petitioner proposes. Opp. at 15-16. Respondent noted that Petitioner complains of dizziness and various other symptoms of dysautonomia, and that she is on a fluid restriction protocol to regulate her sodium levels. *Id*. Respondent acknowledges that Ms. Warnock's emotional state has been affected since her injury, but that she is fortunately still able to perform activities of daily life, including pursuit of full-time employment at a physically demanding job on a farm. *Id*. at 16. Respondent argues that Petitioner's endocrinologist in May 2022 described Ms. Warnock as stable, and that her cardiologist indicated as recently as November 2022 that Petitioner has no physical disability and is able and self-reliant in the performance of her usual daily activities. *Id*. Finally, Respondent notes that Petitioner participates in social activities and is able to drive. *Id*.

The record in this case establishes that Ms. Warnock suffered a very serious and traumatic injury on June 17, 2019, when she received the vaccines. Her fall from her syncope episode was so serious that she fractured her skull and had to be airlifted to the nearest medical center that was able to treat her injuries. At one point in her hospitalization, Ms. Warnock was noted to be in critical condition as she was awaiting transfer to an acute facility. Ex. 3 at 36. Her first hospitalization lasted for 11 days, indicating a very severe injury. Ex. 14 at 55-59. As Ms. Warnock was only 20 years old at the time, this had to have been a very traumatic experience for her and her family.

16

In addition, it is clear that Ms. Warnock suffered some ongoing sequela from her initial traumatic injury. As Petitioner has noted in her brief, she was hospitalized twice for a total of 14 days for her injuries and was taken to emergency rooms on four separate occasions. She has been evaluated and treated by neurosurgery, neurology, endocrinology, cardiology, ophthalmology, and oral surgery, as well as her family care provider. Ms. Warnock has been diagnosed with dysautonomia, hyponatremia, and SIADH.

Ms. Warnock credibly recounted her feelings of fear and anxiety as a result of all her procedures and ongoing treatment. Tr. at 29. She explained in her affidavit that she feels like a different person, grateful for her recovery, but mindful of the limitations she now must endure. Tr. at 43. She has gone from being invincible to timid, worried how her body will react to stresses and new experiences. *Id*. Ms. Warnock's mother and sister describe similar changes in Ms. Warnock's personality and their worry for her future. Thankfully, as both Ms. Warnock and Respondent have noted, Ms. Warnock has made a good recovery, although she may have some lasting sequela as she approaches her future.

Given all of the foregoing, this case reflects circumstances in which a minimum award of $150,000.00 would be fair and reasonable – and in fact a slightly higher award is probably appropriate. While the injury at issue was not life-threatening, and may not be on all fours with the kind of devastating neurologic harm that some vaccine injuries can be shown to produce, the degree of her injury and trauma to her head, and the intrusive medical care required to ameliorate the Petitioner's health was notably high – along with the personal impacts of that treatment. The Program has unquestionably recognized that the residual effects from an episode of vaccine-caused syncope can be severe and significant – and that pain and suffering awards should recognize this.

However, given Ms. Warnock's strong recovery (as her medical records indicate), I do not believe that an award for *future* pain and suffering is adequately substantiated. I would require more specific and compelling evidence of ongoing sequelae in order to favor allowing that component.

But given the traumatic nature of Petitioner's initial injury and subsequent treatment, a reasonable and just result can be fashioned in which the claimant is provided an actual pain and suffering somewhat higher than requested (if still a bit less than the award would be if a future component was included). Accordingly, after considering the severity and duration of Petitioner's syncopal injury along with the personal hardships she has experienced as a result, and considering the arguments presented by both parties at the hearing, a review of the relevant caselaw and the written record, I find that **$170,000.00** in total compensation for actual pain and suffering is reasonable in this case.

17

## IV.    Life Care Plan

*Legal Standard*

Compensation awarded pursuant to the Vaccine Act shall also include "[a]ctual unreimbursable expenses incurred from the date of the judgment awarding such expenses and reasonable projected unreimbursable expenses" that:

(i)     result from the vaccine-related injury for which the [P]etitioner seeks compensation;

(ii)    have been or will be incurred by or on behalf of the person who suffered such injury; and

(iii)   (I)have been or will be for diagnosis and medical or other remedial care determined to be reasonably necessary, or (II) have been or will be for rehabilitation, developmental evaluation, special education, vocational training and placement, case management services, counseling, emotional or behavioral therapy, residential and custodial care and service expenses, special equipment, related travel expenses, and facilities determined to be reasonably necessary.

§ 15(a)(1)(A).

"[R]easonable projected unreimbursable expenses" must be shown to be "reasonably necessary." Section 15(a)(1)(A)(iii). "Special masters have characterized this phrase as a 'vague instruction' and a standard for which there is 'no precise' definition" *Lerwick ex rel. B.L. v. Sec'y of Health & Hum. Servs.*, No. 06-847V, 2014 WL 3720309, at *5 (Fed. Cl. Spec. Mstr. June 30, 2014); *see also I.D.*, 2013 WL 2448125, at *6 (defining "reasonably necessary" to mean "that which is required to meet the basic needs of the injured person ... but short of that which may be required to optimize the injured person's quality of life" (quoting *Scheinfield v. Sec'y of Health & Human Servs.*, No. 90-212V, 1991 WL 94360, at *2 (Cl. Ct. Spec. Mstr. May 20, 1991))); *Bedell v. Sec'y of Health & Hum. Servs.*, No. 90-765V, 1992 WL 2666285 (Cl. Ct. Spec. Mstr. Sept. 18, 1992) (defining "reasonably necessary" to mean "more than merely barely adequate, but less than the most optimal imaginable"); *Alonzo v. Sec'y of Health & Hum. Servs.*, No. 18-1157V, 2023 WL 5846682, at *11 (Fed. Cl. Spec. Mstr. Aug. 14, 2023).

### A.  Life Care Plan Elements

The parties agree that the only differences between the two life care plans each submitted are the costs of three of Petitioner's medications/supplements: Florinef, salt tabs, and Micronor. *Compare* Ex. A at 5, 6 *with* Ex. 46 at 15, 16.4; ECF 68 at 20 n. 39;

18

Opp. at 12, fn. 4. Petitioner's life care planner stated that the cited medication prices "include costs obtained specifically from local pharmacies in [Petitioner's] area…" Ex. 46 at 13; *see also* Ex. 46 at 15, 18. Respondent's life care planner indicated that her pricing for the same items came from the online source www.goodrx.com. Ex. A at 3. Respondent argues that the lower price for the exact medication prescribed to Petitioner is both prudent and "*reasonably* necessary" pursuant to 42 U.S.C. §300aa-15(a)(1)(A)(iii)(I) (emphasis added).

Respondent's argument is persuasive on this point. The lower price for the medication is in line with the Vaccine Act's language of "reasonably necessary" and thus, I will award the pricing of the three medications as set forth in Respondent's life care plan.

### B. Form of the Award of the Life Care Plan

Regarding the form of the award for future medical care, the Vaccine Act provides that the special master may order that payment of compensation may include the purchase of an annuity if determined to be in the best interests of petitioner. 42 U.S.C. § 300aa-15(f)(4)(A).

Petitioner has requested that the cost of the life care plan be awarded as a lump sum for the entirety of the cost of the plan. Mot. at 20. Respondent has proposed that Petitioner be awarded a specific amount for first-year life care plan expenses, and then an amount sufficient for the Government to purchase an annuity contract to fund the remaining life care plan items, as recommended by Respondent's life care planner in Ex. A, for Petitioner's benefit over her lifetime. Respondent proposes an annuity purchase instead of a lump sum payment, as a reasonably necessary and prudent measure, to enable adequate medical coverage for Ms. Warnock.

As Respondent has stated, the longstanding practice in the Program has been to award funds for future life care items via a life-contingent annuity, with an initial, lump sum for first-year life care plan costs. Petitioner has not presented any compelling argument as to why this practice should not be followed. Thus, the funding of the life care plan will be as set forth in Respondent's life care plan and shall consist of a lump sum for Ms. Warnock's first-year life care plan expenses, and an amount sufficient for the government to purchase an annuity contract to fund the remaining life care plan items, as recommended by Respondent's life care planner in Exhibit A, for Ms. Warnock's benefit over her lifetime.

## V.    Lost Earnings Damages Component

*Legal Standard*

The Vaccine Act provides for recovery of "actual and anticipated loss of earnings determined in accordance with generally recognized actuarial principles and projections," where the injured party's "earning capacity is or has been impaired by reason of such person's vaccine-related injury." Section 15(a)(3)(A). The calculation of lost earnings damages must be performed in a "cautious manner 'in accordance with generally recognized principles and projections.'" *Brown v. Sec'y of Health & Hum. Servs.*, No. 00-182V, 2005 WL 2659073, at *6 (Fed. Cl. Spec. Mstr. Sept. 21, 2005) (citing Section 15(a)(3)(A)).

Compensation awarded for a petitioner's anticipated loss of earnings may not be based on speculation. *J.T. v. Sec'y of Health & Hum. Servs.*, No. 12-618V, 2015 WL5954352, at *7 (Fed. Cl. Sept. 17, 2015) (indicating Section 15(a)(3)(A) "does not envision that 'anticipated loss of earnings' includes speculation" and denying to calculate lost wages on a planned business venture); *Dillenbeck v. Sec'y of Health & Hum. Servs.*, 147 Fed. Cl. 131, 139 (2020) (*citing J.T.*, 2015 WL 5954352, at *7). It necessarily follows that the Act also does not envision that any actual lost earnings awarded be speculative in nature. The United States Court of Federal Claims has "recognize[d] that the determination of compensation for lost earnings 'in accordance with generally recognized actuarial principles and projections' would likely require expert opinion evidence." *Dillenbeck*, 147 Fed. Cl. at 139.

Petitioner alleges that her vaccine injury restricted her earning ability as a hospitality major and event planner. Mot. at 19-21. Petitioner thus requests lost earnings totaling $114,289.70. *Id.* at 20. Respondent argues that the record shows that Ms. Warnock's earning capacity has not been impaired. Opp. at 18.

*Petitioner's Expert Reports*

*Ms. Caskey Report*

To support her damages claim, Petitioner filed a report from Deborah L. Caskey, a certified vocational evaluator, disability management specialist, rehabilitation counselor and life care planner. Ex. 55 at 1; Ex. 60 at 1. She received her bachelor's degree in education and rehabilitation counseling and psychology from the University of Arizona. Ex. 60 at 3. Ms. Caskey received her post graduate certificate in forensic vocational rehabilitation from the University of Florida and completed her graduate program in rehabilitation and vocational counseling at Liberty University. *Id.* She also obtained an

education in emergency medicine as a paramedic in the United States Army. *Id*.  Ms. Caskey has worked as a vocational expert since 1989 and has reviewed many lost earnings evaluations from economists and other experts. *Id*. at 2.

Ms. Caskey was retained in the present case to provide a calculation for Ms. Warnock's loss of earning capacity due to her vaccine injury. Ex. 55 at 2. To do so, she relied upon Petitioner's medical records, the affidavits of Ms. Warnock, her mother - Ashley Robinson, and her sister – Madison Baker, the parties' respective life care plans, and Petitioner's brief on damages. *Id.* at 3-4. Ms. Caskey briefly details Petitioner's medical history and work experience, focusing on the difficulties Ms. Warnock states she has experienced working in her current and past positions. *Id*. at 4. Ms. Caskey concludes Petitioner's post-injury earnings capacity is $27,000.00 - $29,120.00 per year. *Id*. at 4-5, 8-12.

### *Dr. Oliver's Expert Report*

Dr. Oliver G. Wood, Jr., is a consulting economist retained by Ms. Warnock to prepare an opinion regarding Petitioner's economic damages and loss of earning capacity. Dr. Wood received his Bachelor of Arts and master's degree in economics from the University of South Carolina. Ex. 61 at 1. He received his Ph.D. in Economics from the University of Florida in 1965 and began working as a consulting economist in 1969. *Id*. He has held several teaching positions at the University of South Carolina, including a distinguished professor emeritus and economist in residence at the Charleston School of Law. *Id*.

Dr. Wood prepared an opinion regarding Ms. Warnock's earning capacity and future medical care costs. Ex. 54 at 2 (revised report). He opines that Ms. Warnock's vaccine related losses range from $196,223.00, to $256,679.00, including loss of earnings and offset earnings. *Id*. at 13. They rely on Ms. Caskey's report regarding Ms. Warnock's post-injury earning capacity. *Id*. at 4. Dr. Wood calculates lost earnings damages to Ms. Warnock age 67 based on her Social Security retirement age. Dr. Wood's analysis states that "all elements are discounted to present value at a rate of 5 percent" which is the "rate that an ordinary person with average financial knowledge, with access to commonly available investment outlets, and facing the full range of financial risks might be expected to earn over a long period of time." *Id*. at 3.

### *Respondent's Expert Reports*

Respondent maintains the legal requirements for an award of lost earnings remain unmet. In support of this contention, Respondent has submitted two expert reports: one

from vocational expert Trey Moseley, MA, CRC, and a second report from economist Patrick F. Kennedy, Ph.D. Exs. D, F.

*Mr. Moseley's Expert Report*

Mr. Moseley is vocational expert with a Master of Arts degree from the University of Alabama in 2006, and he has been a Certified Rehabilitation Counselor since 2007. Ex. D at 1. Since 2011, he has provided vocational opinions in workers compensation, long term disability, personal injury, Americans with Disability Act, and vaccine injury cases. *Id*. Mr. Moseley is also a contracted Vocational Expert for the Office of Hearings Operations for the Social Security Administration and has testified in more than one thousand disability hearings. *Id*.

Dr. Moseley's report notes the educational achievements Ms. Warnock has attained since her vaccine injury. Ex. D at 4. He observed that:

> at the time of the injury, Ms. [Warnock] had completed an associate's degree from Central Carolina Technical College and was preparing to complete her Bachelor of Arts degree at Flagler college… Ms. [Warnock] earned her degree from Flagler College on August 6, 2021. According to her transcripts … she performed extremely well academically and graduated Cum Laude with a Grade Point Average of 3.5428. Her attorney also indicated that she had no accommodations made for her by Flagler College during her coursework.

*Id*. As such, Mr. Mosely stated that because Ms. Warnock earned her bachelor's degree, it "only served to increase her earning capacity by means of her educational experience." Ex. D at 4.

Mr. Moseley next lists a representative list of jobs within a reasonable commuting distance from Columbia, South Carolina, which he believed Ms. Warnock was qualified for by means of her training, education, and experience.  Ex. D at 5. These jobs ranged in salary from $45,000.00 to $65,000.00 per year. *Id*.

Mr. Moseley concludes by stating that because Ms. Warnock did well in college and did not require any type of accommodation and has been able to earn a living since graduating college, "indicates that she would more likely than not be successful at other positions earning higher wages. Ex. D at 5. Petitioner's choice to select lower earning positions does not appear to be reflective of her vocational abilities." *Id*.

Based on the lack of medical evidence supporting Ms. Warnock's alleged limitations since the end of 2022, Mr. Moseley stated that "it is my opinion that Ms. [Warnock] has not suffered a loss of earning capacity as a result of her vaccine related injury. She has demonstrated the ability to earn $36,000.00 per year post-injury, and her education and experience, in my opinion, have enabled her to potentially earn a figure of at least $45,000.00 per year, which is significantly more than her current salary. Accordingly, I do not see a basis for a lost wage component to her vaccine injury claim." *Id*. at 6.

### Kennedy Expert Report

Dr. Kennedy is an economist with a doctorate in Economics earned from Stanford University in 1992. Ex. F at 1. He has over 20 years of experience, serving as an expert in the United States Court of Federal Claims, other federal and state courts, and in private arbitrations nationwide. Ex. A, Tab 1. Dr. Kennedy analyses economic loss and damages in a wide range of legal actions. *Id.*

In his report, Dr. Kennedy stated that "[b]ased on the opinions of Mr. Moseley, I have not prepared any calculations of potential lost earnings for Ms. [Warnock]… ," and he thus limited his comments to Dr. Woods's opinion. Ex. F at 3-4. Dr. Kennedy states that the primary difference between his opinions and those of Dr. Woods is that the Woods report relies on the opinion of Ms. Caskey, while Dr. Kennedy relies upon the report of Mr. Mosely. *Id*. Without going into detail about the differences in the economic loss calculations, Dr. Kennedy essentially states that the Woods analysis overstates Ms. Warnock's economic damages by failing to account for income taxes, her remaining work life expectancy, and a miscalculation of damages by using a discounted net present value at a rate of five percent. *Id*. at 5. However, Dr. Kennedy concludes his report by stating that based upon the opinions of Dr. Moseley, there is no loss of earnings. *Id*. at 12.

### Analysis of Lost Wage Issue

Respondent's experts correctly observe that the medical record evidence in this case is not generally supportive of the conclusion that Petitioner's vaccine related symptoms were severe enough to prevent her from doing the kinds of hospitality work that would have generated the lost earnings she seeks. Of note, while relying on her economist's calculation that her total lifetime earning capacity would be $1,142,897.00, Petitioner argued that she should be awarded the equivalent of a ten percent loss of earning capacity. Mot. at 19-20. Importantly, Petitioner acknowledged an "inability to arrive at a number with mathematical precision," (Mot. at 20) which proves the speculative nature of these calculations.

I also observe that while Petitioner's medical records document that she suffered from bouts of lightheadedness, vertigo, and dizziness, they do not establish the existence of any limitations or restrictions placed on Petitioner's ability to engage in work. On the other hand, it demonstrates that Petitioner had mostly recovered from her injury. For example, on May 12, 2023, Ms. Warnock had her annual gynecologic exam which noted that she had "no complaints today." Ex. 57 at 3. The notes from this visit state "[s]eizures have resolved." *Id.* Her vitals and overall exam were normal. *Id.* On May 16, 2024, when Ms. Warnock returned to Lexington Women's Care for suspected pregnancy, it is noted that she had a history of SIADH and seizures, but that "[n]o further seizures of seizure like activity," although some light-headedness and syncope was noted in the review of systems. Ex. 57 at 23. The record does not allow me to conclude that Petitioner could not accomplish her work-related tasks during the relevant time period, or only at a lower level. The above could be addressed by any medical treater who expressed the view that Ms. Warnock was unable to work or placed any health-related restriction on her work or professional endeavors. No such evidence has been offered.

Second, I do not find that Petitioner's witness statements or wage loss narrative fill in these evidentiary gaps. These statements helped establish the nature and contours of her lost earnings claim – but they were not corroborated with sufficient independent evidence to accept the contentions they contained. Affidavits from petitioners and their friends and family are most helpful when they support, elaborate upon, or buttress otherwise unclear medical records and/or other evidence. Petitioner, however, has failed to provide evidence establishing that her "earning capacity is or has been impaired by reason of ... [her] vaccine injury" as required by Section 15(a)(3)(A). Rather, her calculations were rooted in speculation about her abilities– not in "generally recognized actuarial evidence and projections," as required by Section 15(a)(3)(A).

Accordingly, because the record lacks preponderant support for an award of lost wages/earnings in this case, no such award will be permitted.

## VI.    Award for Past Unreimbursable Expenses

The parties have agreed that Petitioner has adequately substantiated her request for $6,978.97 in past out-of-pocket medical expenses through 2022. Mot. at 20; Opp. at 11. After carefully reviewing the documentation submitted by Petitioner and verifying the payments that were actually incurred, I award Ms. Warnock that sum in full.

However, the parties disagree on how the parties should handle additional past unreimbursable expenses incurred in the 2023-25 period. *See* Joint Status Report filed April 10, 2026, ECF No. 104. Petitioner requests $6,275.00, maintaining that amount was anticipated in Respondent's original life care plan chart. *Id.* at 2. Respondent argues,

24

however, that Petitioner has not provided the documentation necessary to substantiate that these medical expenses were actually incurred. Respondent disagrees that the $6,375.00 amount was meant to cover a past expense, but instead argues that it reflects a *future* annuity payout (and hence is not reflective of previously-incurred costs). *Id*.

Respondent's interpretation is more persuasive. There was a temporal delay in resolving damages in this case, and thus costs that would have been prospective now appear retrospective – but have not been adequately substantiated to be paid back by a lump sum. Instead, the additional past unreimbursable expenses from 2023-25 will be paid out as originally set forth in Respondent's life care plan and updated appendices.

### Conclusion

Based on the record as a whole and arguments of the parties,

1.    **I award Petitioner the following:**

   A.    **a lump sum payment of $<u>176,978.97</u>, (representing $170,000.00 for Petitioner's actual pain and suffering, plus $6,978.97, for past unreimbursable expenses), and**

   B.    **Future medical expenses comprised of 1) a lump sum of $2,904.00 for first-year expenses. Components A and B are to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.**

2.    **In addition, I award an amount sufficient for Respondent to purchase and fund an annuity contract for Petitioner's benefit that will provide payments for the life care items contained in Respondent's life care plan, and as illustrated by the appendixes filed by Respondent, including the updated chart at Appendix A, Updated Summary of Life Care Plan Items (ECF No. 104), Appendix A.**

These amounts represent compensation for all damages that would be available under Section 15(a). The Clerk of the Court is directed to enter judgment in accordance with this Decision.[3]

---

[3] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master